**George Robert Goltzer**
**Attorney At Law**
**600 Fifth Avenue**
**10th Floor**
**New York, NY 10020**

**George R. Goltzer**
**Ying Stafford**

Tel. (2 12) 608-1260
Cell (917-553-6704
Fax: (1646) 430-8944
grgoltzer@gmail.com

February 9, 2016

Re: *United States v. Tyrell Whitaker*
S1 12 Cr. 626 (ER)

Hon. Edgardo Ramos
United States District Judge
Southern District of New York
United States Courthouse
40 Centre Street
New York, NY 10007
via ECF and Federal Express

Dear Judge Ramos:

     This letter memorandum is respectfully submitted in anticipation of adult sentencing, currently scheduled for February 26, 2016 at 2:45 p.m., if Your Honor denies the defense motion to vacate the prior transfer to adult status and sentence Tyrell Whitaker as a juvenile. We have examined the presentence report and reviewed it with Tyrell. While we do not object to the advisory guideline calculation, we strongly object to the recommendation of a life sentence without parole for this particular offender in this particular case. The recommendation is but a shrill cry for vengeance that invites violation of the Eighth Amendment's proscription against cruel and unusual punishment, and cavalierly ignores recent and enlightened Supreme

1

precedent. See, Montgomery v. Louisiana, __ U.S. __ (2016)(decided January 26, 2016).[1]  The sentencing calculus surrounding punishment of offenders who sinned before their eighteenth birthday, as Tyrell Whitaker was found by the jury to have done, is different from the norm applied to adults who face a guideline with a maximum of life without parole.

The Supreme Court has repeatedly recognized critical differences between children and adults. See, Montgomery, slip opinion at 15-16. First, children lack maturity and have an underdeveloped sense of responsibility that leads to

---

[1] Presentence Reports in this District most often recommend a Guideline sentence  even though the advisory Guideline is but one factor that the Court must consider.  The parsimony clause of 18 U.S.C.  § 3553(a) directs sentencing jurists to impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposed set forth in" subsection (2) of the statute. *United States v. Ministro-Tapia,* 470 F.3d 137, 138 (2d Cir. 2006). In determining the sentence, the Court must consider the following "§ 3553(a) factors:"

- ♦ the nature and circumstances of the offense, § 3553(a)(1);

- ♦ the history and characteristics of the defendant, § § 3553(a)(1);

- ♦ the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense, ; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide the defendant with needed rehabilitative or other treatment, § 3553(a)(2);

- ♦ the Sentencing Guidelines and the sentencing range they provide, § 3553(a)(4), (5);

- ♦ the need to avoid unwarranted disparities in sentencing, § 3553(a)(6);

- ♦ the need to provide restitution to the victims of the offense, § 3553(a)(7).
  18 U.S.C. § 3553(a).

recklessness, impulsiveness and risk-taking. Second, they are more vulnerable to negative influences from family and peers, with limited ability to control their environment and extricate themselves from horrible, crime-producing settings. Third, the child's character is not as well formed as an adult's and his actions are less likely to be indicative of "irretrievable depravity".  These attributes of youth diminish the penological justifications for imposing life without parole. Children are not as blameworthy as adults as adolescent development diminishes the likelihood that a juvenile offender will forever be a danger to society. Rehabilitation cannot justify life without parole since the sentence itself contradicts the notion of rehabilitation.

The Montgomery court held that the proscription against sentencing juvenile offenders to mandatory life without parole enunciated in Miller v. Alabama, 567 U.S. __ was retroactive as it set forth a substantive rule of law. The Court stated, at slip opinion 16-17:

> Miller, then, did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole; it established that the penological justifications for life without parole collapse in light of "the distinctive attributes of youth." *Id.,* at __(slip op., at 9). Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects "unfortunate yet transient immaturity.'" *Id.*, (slip op., at 17)(quoting Roper, 543 U.S., at 573). Because Miller determined that sentencing a child to life without parole is excessive for all but "the rare juvenile offender whose crime reflects irreparable corruption, 567 U.S. at__(slip op., at 17)(quoting Roper, *supra*, at 573), it rendered life without parole an unconstitutional penalty for " a class of defendants because of their status" – that is, juvenile offenders whose crimes reflect the transient immaturity of youth.....

Sentencing Tyrell to die in prison would clearly violate the proscription against cruel and unusual punishment within the meaning of the Eighth Amendment as interpreted by Montgomery, Miller, and Roper. Tyrell  is not the rare adolescent who is irredeemably corrupt. Indeed, the extraordinary and plentiful mitigation attendant to this case cries out for a very substantial variance from the advisory guideline for this first offender

who did not intend to kill anyone and did not kill anyone during an attempted robbery gone bad.

Tyrell's painful odyssey through his Young life reflects many mitigating factors which support a very substantial variance from the advisory guideline, a guideline fixed for adults set in their ways, not impressionable adolescents whose brains were not fully formed, young and impressionable people most often redeemable, as Tyrell Whitaker has proven himself to be. The mitigating factors are:

- extraordinarily strong likelihood of rehabilitation;
- family dysfunction;
- adolescent immaturity;
- remarkable self rehabilitation for 18 months in North Carolina;
- favorable response to earlier rehabilitative efforts;
- successful completion of probationary period in high school;
- following of court mandated community service;
- no prior criminal record;
- relatively minor arrest record in his Newburgh social milieu;
- ability to obtain and hold employment;
- ability to engage in positive goal directed activities
- ability to relate well to adult friends and co-workers;
- ability to engender trust sufficient to care for young children;
- ability to pay rent, other bills, and maintain home;
- ability to assist family members in distress;
- ability to cope with mentally ill sibling;
- ability to ultimately reject "gangsta" subculture;
- possession of positive ambition, desire to learn and improve;
- lack of mental illness or apparent antisocial personality disorder;
- lack of violent or cruel personality;
- sufficient intelligence to profit from rehabilitative programs;
- mitigating factors surrounding concededly serious alleged crimes.

We strongly urge a sentence of no more than ten years for Tyrell Whitaker under the facts and circumstances of his life and case as det forth below.

### Tyrell Whitaker[2]

Tyrell was born in Newburgh, New York on March 14, 1993. His biological father left the family shortly after he was born. He was a drug abuser who rarely worked and was occasionally incarcerated. He hardly supported his children.

Tyrell's mother was the product of a scandalous relationship between her natural mother and a local clergyman in Newburgh. The scandal caused her mother to place her in foster care. She was returned to her mother 7 years later because of sexual abuse in her foster home. At 19, her oldest son, Gregory, was born. She raised him as a single mother until she married Tyrell's father several years later. For several years, Gregory has suffered a bipolar disorder and unspecified psychosis. He suffered his first psychotic break while recuperating from a gunshot wound sustained in a drive-by shooting.

Tyrell lived in Florida with his mother and stepfather from the ages of 3 to 10. When his stepfather lost his job and could no longer find work, the family returned to Newburgh, which was fast becoming a hellish locale. It became so bad that Tyrell's mother knew they had to leave. Indeed,

---

[2]The defense utilized the services of former Federal pretrial services and probation officer Kathleen O'Boyle, then of the National Center for Institutional Alternatives. Her comprehensive investigative and evaluative report was annexed to our initial opposition to the government's transfer motion. We once again incorporate it by reference and rely upon it for the factual narrative in this sentencing letter. The government has never contested these facts.

Tyrell lost one of his best friends to senseless gang violence when, as an innocent bystander, he was shot and killed by a Latin King who mistook him for a rival gang member. The stepfather was fortunate enough to find work in North Carolina with the assistance of a relative and the family relocated.

Tyrell was unhappy about leaving his friends; he had a difficult time adjusting to living down South. He had completed middle school in Newburgh and enrolled in a Raleigh high school where, according to Tyrell and his mother, he was frequently in trouble for truancy and disobedience. He was suspended in the spring semester of his 9th grade, but records indicate that his suspension ended in June and that he would be allowed to return to school for the fall semester. It was likely, based on the fact that he was absent for 25 days that semester and failed most of his classes, that he would have to repeat the 9th grade. Unfortunately, Tyrell did not return to school and his plans to get an equivalency diploma were sidetracked when he left Raleigh to return to Newburgh.

In February 2010, Tyrell's mother sent siblings Tyrell and Tyree to Newburgh to stay with her brother, while she and her husband went on a vacation cruise. Tyrell was still 16, a month short of his 17th birthday. Tyrell and his brother quickly adjusted to being back with old friends and extended family. Crime and gang violence in Newburgh had only increased in the 3 years since Tyrell had left for Raleigh. Nevertheless, Newburgh was home. After a few months, Tyrell's uncle complained to Tyrell's mother, that Tyrell was spending more and more time away from home. Tyrell's mother soon learned that Tyrell was spending most of his time at the home of Latoya Smalls. Smalls was, according to Tyrell's mother, "one of those women who hangs out with her children's friends and other neighborhood teenagers." Tyrell's mother was convinced that as long as Smalls gave her sons a place to live, where they could come and go as they pleased, it would be nearly impossible to get them to return to the more stable environment of Raleigh. Eventually, a few months after the

Henry felony murder, and after much pleading on his mother's part, Tyrell returned to Raleigh on March 17, 2011, three days after his 18th birthday.

Tyrell was placed in special education classes on several occasions. School records submitted by the defense reflected that Tyrell was eventually designated as "Specifically Learning Disabled" (SLD) in junior high school and in every yearly evaluation thereafter until he left school. He had significant learning and cognitive disabilities which contributed to his behavioral difficulties in school, including his impulsiveness, low frustration level, limited coping skills and emotional immaturity.

A psychological evaluation conducted when Tyrell was in the eighth grade, concluded that:
> "[T.W.] is significantly weak in areas pertaining to basic reading skills. His sight vocabulary is limited. He struggles to decode words effectively; this deficit has a negative impact on his spelling skills as well. Reading comprehension seems to be average. In the area of math, [T.W.] is average in math calculations while his math reasoning skills are low average.... His conduct appears to be weak at school, but significantly weaker at home. There is no evidence of internalizing problems at school; at home he is extremely elevated in characteristics generally associated with depression... . This evaluation indicates that [T.W.] is significantly delayed in all academic areas, when compared to the previous administration of the WASI, which yielded a full scale I of 106."

At least two psychological evaluations indicated "elevated indications of depression and behavioral symptoms." Though some of his school infractions were for inappropriate behavior with staff, most of them were for things such as skipping and being disruptive in class, participating in a cafeteria food fight, throwing staples at other students in class and leaving

class without permission. School records do not indicate that Tyrell was considered incorrigible. On the contrary, two separate evaluations a year apart concluded that TW did not meet any of the nine characteristics or criteria that would identify him as a "Behavioral and Emotionally Disturbed" (BED) individual, including "evidence of a marked deviance from the student's peer group."

Tyrell had problems with school and juvenile authorities when he was 15 and 16 years of age. In January, 2008, a juvenile complaint was filed after Tyrell was found to be in possession of a pocket knife on school property. He also had a March 31, 2009 arrest for trespass, resisting arrest and governmental administration. Both cases were disposed of after Tyrell successfully completed a community service mandate, and in the second instance, after a six-month period of probation supervision. Tyrell successful completion of court mandates indicated that he was receptive to rehabilitative efforts.

Tyrell had never been convicted of a criminal offense before his federal trial and conviction. He has two pending criminal cases, both misdemeanors, stemming from arrest during the period he was living on his own in Newburgh. The first is for August 13, 2000 arrest for misdemeanor criminal possession of a controlled substance in the 7th degree and possession of marijuana in the 5th degree. The police report indicates that Tyrell was in possession of the bag of marijuana and 6 glassine envelopes of heroin when he was found in apartment bedroom by police, who had followed him into the apartment after allegedly observing him putting marijuana in a bag in public view in front of the building. Tyrell was released following arraignment. 8 days later, on August 20, 2010, he was arrested for resisting arrest, obstruction of government administration and harassment.

The second arrest resulted from a domestic incident involving Tyrell's mentally ill brother, Gregory O'Neill, and Gregory's girlfriend and mother

of his 3-year-old child. They were arguing, she from inside the house and he from the street in front of it. The girlfriend called the police, aware that Gregory was having an adverse reaction to failing to take his medication. The New York State Incident Report reflected conflicting police narratives, all of which claimed that Tyrell obstructed justice.

Not surprisingly, Tyrell's version of this incident is quite different. He, the girlfriend and several others were trying to explain to the officers on the scene that Gregory was mentally ill and not simply combative. They begged the police not to hurt Gregory. Although the police were told in advance of Gregory's illness, and that he needed to be approached in a calm manner, the police were rough from the start, which caused Gregory to react violently. The more he resisted, the more force the police used. Finally, Tyrell jumped on one of the officers backs in an attempt to pull him off his brother. Tyrell got angry and resisted arrest. Although Gregory was arrested, he was soon transferred to a mental hospital for psychiatric evaluation and treatment. Tyrell was also taken to the hospital to have taser prongs removed from his back. Neither case has been resolved.

Remarkably, after he left the horrific Newburgh environment, Tyrell spent 18 months there transforming his adolescence from unproductive truancy to responsible employment and family responsibility. Shortly after arriving in Raleigh, he secured employment stocking shelves at a local supermarket. Rather than live in a cramped conditions with his mother, stepfather and 2 brothers, Tyrell rented cheap hotel room and later rented a room in the home of a man named Leonard Brooks. Brooks said he had known Tyrell when Tyrell was a fellow student of his next-door neighbor. He took to Tyrell right away and viewed himself as a "big brother" of sorts. When he learned that Tyrell had returned to Raleigh, he offered him room and board for $75 a week. The room was in Brooks' house, where he lived with his wife and 3 young children. Brooks relates that Tyrell was quiet and respectful, and that he and his wife trusted him to the extent that they

would ask them to watch their children and bring them to school when the babysitter was unavailable. Tyrell was good with the children, and the children liked him. Brooks stated that Tyrell saved most of his weekly salary and that in February 2012, moved into his own apartment.

Tyrell worked part-time at the supermarket from March 12, 2011 till July 22, 2011, earning $7.25 per hour. Then he obtained a higher-paying position at Walmart, where he worked from May 11, 2011 until May 12, 2012, earning $9.75 per hour. Tyrell kept his part-time job at the supermarket for several weeks after he began working at Walmart. He would have kept both jobs but for the fact that he no longer had a ride to the supermarket and public transportation took too long to get there. According to Ms. Dorothy Davis, human resources director at the Walmart location, "he was an excellent employee" and he left "in good standing" to take a position with the United States Post Office, where he was employed from June 2, 2012 until his arrest for the instant offense on September 6, 2012.

Mr. William King, a friend of Tyrell and his mother, and former coworker with Tyrell at Walmart, had obtained employment with the post office and soon afterwards helped Tyrell apply . Tyrell was hired as a part-time mail handler. Because he didn't drive, Mr. King picked Tyrell up and drove him to work. They worked side-by-side on the night shift for the 3 months that Tyrell was employed. Mr. King stated that it was "a pleasure" spending time in working with Tyrell. He described Tyrell as "polite," "respectful" and a "hard worker who never took a day off." King also stated that Tyrell was quiet and reserved at work. He was friendly and well-liked by others on their shift.[3]

---

[3] According to Ms. O'Boyle, it was interesting to note that when Tyrell was working in Raleigh, associating with coworkers who were older and emotionally mature, he seemed to emulate their positive behavior and

After Tyrell returned to Raleigh, his mother began to have serious problems. She and her husband separated due to the stress of caring for mentally ill son Gregory. Gregory's condition had worsened to the point where Tyrell's mother filed for legal guardianship. Gregory was simply unable to care for himself. Tyrell took his mother and Gregory into his apartment, with the lease and all of the utility bills in Tyrell's name. Tyrell gave his mother money to pay the bills until he began to receive late notices. After that, he asked his mom for receipts for the money orders, so that he could be sure she had paid the bills. Tyrell's mother explained that living with Gregory was extraordinarily difficult because he sometimes heard voices and talked to himself, pacing the apartment back and forth at all hours of the day and night. "He would drive Tyrell crazy" and sometimes Tyrell yelled at his brother. But Tyrell was never mean to Gregory and never touched or threatened him.

Tyrell worked at the post office until the day he was arrested for the Henry felony murder in September, 2012. It his 18 months in Raleigh, he was steadily employed in increasingly better paying jobs and gaining the respect of people he worked with, individuals from an older generation, with their own families, long employment histories and old-fashioned values. He moved from a hotel, where he stayed when he arrived in Raleigh, to a rented room, and eventually to his own apartment. There, he helped his mother and disabled brother. These were remarkable accomplishment for someone of Tyrell's age and background and represent clear and convincing evidence of his potential for rehabilitation and strong core of decency.

Tyrell Whitaker has great potential as a decent, caring human being who can and will again live a productive, law abiding life of work and

---

values.

loving relationships with positive role models and loved ones. He hopes to educate himself further, work hard, marry and raise a family. He should be given that chance. His amazing self rehabilitation in Newburgh proves our point.

The felony murder for which the jury found Tyrell guilty was an isolated, aberrational, impulsive, violent act during an attempted robbery orchestrated by older accomplices, an attempted robbery that went terribly wrong when one of the robbers was disarmed, a struggle ensued, and Mr. Henry was shot. But we now know with certainty that Tyrell did not fire the fatal shots. The bullet that killed Henry was from a gun that nobody testified Tyrell carried.

The crimes of conviction was the product of a horrible urban environment in one of America's worst cities, fueled by peer pressure and debilitating and a counterproductive "gangsta" subculture. But it was not a premeditated assassination by an antisocial personality disordered youth without potential for rehabilitation and productive adulthood. There is overwhelming mitigation in this case that cries out for the major variance we urge.

I take the liberty of including a passage from a summation of Clarence Darrow in the Leopold- Loeb murder case, a passage that has always resonated with me and I hope will resonate with Your Honor.

> If there is such a thing as justice it could only be administered by one who knew the inmost thoughts of the man to whom he was meting it out. Aye, who knew the father and mother and the grandparents and the infinite number of people back of him. Who knew the origin of every cell that went into the body, who could understand the structure and how it acted. Who could tell how the emotions that sway

the human being affected that particular frail piece of clay. It means more than that. It means that you must appraise every influence that moves men, the civilization where they live, and all society which enters into the making of the child or the man! If Your Honor can do it- if you can do it you are wise, and with wisdom goes mercy.[4]

Thank you for your consideration of these remarks. I remain

Respectfully,
*S/GR Goltzer*
George R. Goltzer

cc: Office of United States Attorney
  Southern District of New York
  Andrew Bauer, Esq.
  Parvin Moyne, Esq.
  Assistant U.S. Attorneys
  Via ECF

GRG/ms

---

[4] Attorney For the Damned, Clarence Darrow in the Courtroom, Edited by Arthur Weinberg: University of Chicago Press (1957, 1989)