George Robert Goltzer
Attorney At Law
152 West 57th Street
8th Floor
New York, New York 10019

Ying Stafford
Associate

Tel. (212) 608-1260
Fax (1646) 430-8944
Cell: (917) 553-6704
grgoltzer@gmail.com

October 5, 2020

Hon. Edgardo Ramos United States
District Court Judge
Southern District of New York
Thurgood Marshall Courthouse
40 Centre Street
New York, New York 10007

Re: *United States v. Tyrell Whitaker*
12 CR 626 (ER)

Dear Judge Ramos:

This letter is respectfully submitted in anticipation of Tyrell Whitaker sentencing hearing, currently scheduled for October 20th, 2020. The defense agrees with the Guideline calculations contained in the presentence investigation report. With respect to the Probation's recommendation of a sentence of life without parole consecutive to a seven-year mandatory minimum sentence, I must say this recommendation is the most ignorant, unconstitutional, heartless, cruel and misguided recommendation I have seen in my forty-five years as a member of the bar of the Southern District. It is simply shocking, horrifying and disgusting.

The jury, by its verdict, found that seventeen-year-old Tyrell Whitaker brandished a firearm during a robbery of a Newburgh drug spot but did not fire the gun. (*See* Verdict Sheet, attachment 1). After the robbery, according to trial testimony, Whitaker was seen lying on the floor weeping, in a fetal position. Then, shortly after the crime, Whitaker left Newburgh, returned to his North Carolina family, and rehabilitated himself in a remarkable fashion, as fully described in our submissions in connection with the government's application to have this juvenile treated as an adult. The defense submissions, including mitigation expert Kathleen O'Boyle's complete report are annexed as

attachments (*See* Mitigation Report, attachment 2[1] and 28 § U.S.C. 2241 and Rule 33 petitions, attachment 3). For eighteen months before his arrest on the current charges, Whitaker had rented a home, cared for friend's children and secured employment with the United States Post Office. Then, after his arrest, Whitaker spent almost eight years at the MCC[2] undergoing further remarkable redemption and rehabilitation under difficult and at times frightening and torturous conditions.[3] We have annexed numerous exhibits that - despite the conditions of confinement at the MCC – attest to Tyrell's actions, progress and potential. He was, and is, an extraordinary young man who has overcome tremendous disadvantages and is poised to be an exemplary member of society. Life without parole? Is offensive!

      The defense has a sliding scale of recommendations of its own which are consistent with current science and jurisprudence from the United States Supreme Court and Second Circuit. First, we have earlier petitioned for vacatur of the adult conviction and an order that Tyrell be treated as a Juvenile Offender, petitions under 28 § U.S.C. 2241 and Rule 33, F.R. Crim. Pro., respectfully incorporated by reference. *See* ECF Doc. No. 274. My search of the docket indicates that the petition is still *sub judice.* It can and should be granted now as it is clear that the government knowingly misrepresented critical exculpatory facts in that stage of the litigation. Most notably, the government said that Whitaker and another fired the shots that killed Jeffery Henry. Tyrell could not have been the person who killed him. (*See* Transcript excerpt attachment 4). We learned at trial what the government always knew, the .38 caliber revolver allegedly brandished by Whitaker could not have killed Henry. Whitaker was denied Juvenile Offender status, in large part, by virtue of the government's misrepresentations, in violation of the Due Process Clause of the Fifth Amendment as defined in *Brady* and its progeny. So, our first application is vacatur and Juvenile treatment.

      If our first petition is denied, we respectfully recommend a sentence that is the equivalent of time served, seven years consecutive to a day. Tyrell has already served that sentence. Indeed, as Your Honor sentences him, he will have been in presentence custody for eight years and fifteen days, the almost equivalent, when one considers credit for good time, of a nearly ten-year sentence. See exhibit \*. That is enough for this fine young man, without prior criminal conviction, who has transformed himself from an immature youth to a mature adult after a tragic and aberrational lapse in judgment so many years ago that sadly led to a man's death, but a death that was not caused by Tyrell.

      Presentence reports in this District most often recommend a Guideline sentence though the advisory guideline is but one factor that the court must consider. The parsimony clause of 18 U.S.C. §3553(a) directs sentencing jurists to impose a sentence that is "sufficient, but not greater than

---

[1] This particular attachment is submitted under seal to the Court because it is part of a sealed proceeding.

[2] MCC as the Court is aware has for some time even before the failed response to COVID pandemic, has been a very difficult facility for inmates. (*See* Dr. Venters Report and Gothamist Article "Prisoners Endure A nightmare 'Gulag' In Lower Manhattan", attachment 5).

[3] We discuss *infra* the details of some of the numerous injustices that Tyrell has suffered while incarcerated at the MCC.

necessary, to comply with the purposes set forth in" subsection (2) of the statute. *United States v. Ministro-Tapia,* 470 F.3d 137, 138 (2d Cir. 2006). In determining the sentence, the court must consider the following 3553 (a) factors:

- The nature and circumstances of the offense, § 3553(a),
- The history and characteristics of the defendant, § 3553(a)(1);
- The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide the defendant with needed rehabilitative or other treatment, § 3553(a)(2);
- The sentencing Guidelines and the sentencing range they provide, § 3553(a)(4),(5):
- The need to avoid unwarranted disparity in sentencing, § 3553(a)(6)[4]
- The need to provide restitution to the victims of the offense, § 3553(a)(7).

When considering crimes committed by juveniles, the calculus if different still. Age must be a significant part of the calculus

Scientific research on the adolescent brain development continues to show that the brain of a 15 or 17-year-old is very different from the brain of a 30-year-old. These differences impact an adolescent's impulse control, long-term planning, and reasoning abilities. Since 2005, the U.S. Supreme Court has begun to acknowledge that these developmental differences make adolescents less morally culpable and more capable of rehabilitation than adults. As a result, the U.S. Supreme Court has held that the Eighth Amendment requires individuals under eighteen years of age be sentenced differently from adults. It is required that sentences for juveniles provide "a **meaningful opportunity** to obtain release based on demonstrated maturity and rehabilitation"—except in the rarest of homicide cases where the sentencer determines that the child is "irreparably corrupt" and rehabilitation is impossible. *United States v. Delgado,* 5-1453 (August 18, 2020)(2d Cir.).

This is not that rarest of homicide case that a juvenile is "irreparably corrupt." There is no argument to be made that Tyrell Whitaker is "irreparably corrupt." In fact, it is undisputed, that Tyrell Whitaker, prior to his arrest in this case, made a decision that was intended to change the course of his life. In spite of the fact, that he was born into an environment plagued by poverty, neglect, gangs, drugs, and death of loved ones, he made the decision to turn his life around. In an incredibly short period of time, Tyrell Whitaker did turn his life around. It was not easy but he did not give up at any point in is pursuit for a better life for himself and more importantly for his family – his mother and brother. Regardless of the many obstacles that Whitaker faced in his pursuit of a better life, he never faltered, he never felt sorry for himself and he never looked back. And as result, he did indeed succeed and obtained a dream job that gave him much needed self-esteem to work for the United States Postal Service, a job that supported him in becoming an independent person and a job that gave him the ability to help his family.

---

[4] *See* sentencing minutes of James Williams, attachment 6).

As stated previously, the Supreme Court has changed the legal landscape regarding the treatment and sentencing of juveniles since Tyrell Whitaker was certified as an adult after his arrest in this case. The evolving position of the Supreme Court has been summarized in the now seminal case *of Miller v. Alabama*, 132 S. Ct. 2455 (2012), that held mandatory life-without-parole sentences violate the Eighth Amendment when imposed on children. Under *Miller*, children facing the possibility of life-without-parole sentences are entitled to "individualized sentencing," and the sentencer must give mitigating effect to the characteristics and circumstances of youth. The Supreme Court held, in part, the following:

> Our decisions rested not only on common sense—on what "any parent knows"—but on science and social science as well. *Id*., at 569. In *Roper*, we cited studies showing that "'[o]nly a relatively small proportion of adolescents'" who engage in illegal activity "'develop entrenched patterns of problem behavior.'" Id., at 570 (quoting Steinberg & Scott, Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty, 58 Am. Psychologist 1009, 1014 (2003)). And in *Graham*, we noted that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds"—for example, in "parts of the brain involved in behavior control." 560 U. S., at  (slip op., at 17). We reasoned that those findings—of transient rashness, proclivity for risk, and inability to assess consequences—both lessened a child's "moral culpability" and enhanced the prospect that, as the years go by and neurological development occurs, his "'deficiencies will be reformed.'" Id., at (slip op., at 18) (*quoting Roper*, 543 U. S., at 570). *Miller v. Alabama*, \*page\*132 S. Ct. 2455 (2012).
>
> Imprisoning an offender until he dies alters the remainder of his life "by a forfeiture that is irrevocable." *Ibid*. (*citing Solem v. Helm*, 463 U. S.  277, 300–301 (1983)). And this lengthiest possible incarceration is an "especially harsh punishment for a juvenile," because he will almost inevitably serve "more years and a greater percentage of his life in prison than an adult offender." *Graham*, 560 U. S., at (slip op., at 19–20). The penalty when imposed on a teenager, as compared with an older person, is therefore "the same . . . in name only." *Id*., at (slip op., at 20). All of that suggested a distinctive set of legal rules: In part because we viewed this ultimate penalty for juveniles as akin to the death penalty, we treated it similarly to that most severe punishment. *Id*.

Most recently, in *U.S. v. Delgado,* 15-1453 (Aug. 18, 2020)(2nd Circ.), the Second Circuit Court of Appeals vacated the defendant's sentence imposed by the district court stating that "mandatory life-without parole sentences for juvenile offenders categorically violated the Eighth Amendment's prohibition on cruel and unusual punishment. *Miller v. Alabama*, 567 U.S. 460, 465 (2012). The Court of Appeals stated clearly held that "[t]he district court imposed [defendant]

4

Delgado's sentence without explicitly considering his age at the time of the murders." *Id* at 7. More specifically, the district court at the "the sentencing hearing d[id] not indicate that there was deliberate consideration of his character as a juvenile, a constitutionally distinct class of defendants. *Miller* requires the district court to undertake additional reflection on the special social, psychological, and biological factors attributable to youth, and such reflection is absent from [defendant] Delgado's sentencing hearing transcript." *Id* at 32. Specifically, the Second Circuit held that "[…] in ignoring the consideration of [the defendant's] age [the court] […] violated the principle recognized by the Supreme Court in *Miller v. Alabama* that 'children are constitutionally different from adults for purposes of sentencing." 567 U.S. 460, 471 (2012). Those under the age of eighteen are different, *Miller* instructs, because the "distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes.'" *Id*. at 472." *United States v. Delgado*, 15-1453 at * (Aug. 18, 2020)(2nd. Circ.), *citing Miller v. Alabama*, 567 U.S. 460 (2012).

Seven years ago, in 2013, the Whitaker defense team, during the juvenile status litigation, accurately identified several mitigating factors pertaining to Tyrell Whitaker, years before his continued post trial rehabilitation and redemption, all critical to evaluating the § 3553 factors and militating against a life sentence. They were:

- extraordinarily strong likelihood of rehabilitation;
- family dysfunction;
- adolescent immaturity;
- remarkable self-rehabilitation for 18 months in North Carolina;
- favorable response to earlier rehabilitation efforts;
- successful period of probation in high school;
- following of court mandated community service;
- no prior criminal record;
- relatively minor arrest record in the Newburgh social milieu;
- ability to obtain and hold employment;
- ability to engage in positive goal directed activities;
- ability to relate well to adult friends and coworkers;
- ability to engender trust sufficient to care for young children;
- ability to pay rent, other bills and maintain home;
- ability to assist family members in distress;
- ability to cope with mentally ill sibling;
- ability to ultimately reject "gangsta" subculture;
- possession of positive ambition, desire to learn and improve;
- lack of mental illness or apparent antisocial personality disorder;
- lack of violent or cruel personality;
- sufficient intelligence to profit from rehabilitive programs;
- mitigating factors surrounding concededly serious alleged crimes

We have annexed as attachments letters from the most respected rehabilitive program in the district, the Focus Forward Project. They are so glowing in their positive prognosis of Tyrell's

future that we take the liberty of quoting liberally from them. (*See* FFP Letters, attachment 7).

The Focus Forward Project ("FFP") classes are made up of two volunteer facilitators and 6-15 participants. The 12-week class meets once a week for two hours, and participants are required to complete weekly reading and journal assignments. The first hour of class is spent discussing and analyzing a book. The second hour of the class focuses on a different life skill each week.

The classroom model is based on using a small group setting to create a community where participants are encouraged to discuss the feelings, emotions, and difficulties they are facing while incarcerated or out on bail awaiting trial or sentencing in a constructive manner. Facilitators encourage and direct discussion based on these expressions and then relate experiences to the specific themes expanded upon within each classroom session. By engaging in honest dialogue and classroom exercises that focus on improving self-confidence and self-worth, participants are able to better utilize their period of incarceration or pretrial supervision and prepare for re-entry.

By the end of the course, participants walk away with a completed working resume, interview skills, conflict resolution skills, public speaking skills and both long and short term because he knew the program was critical to his path to success should he be released. Briefly, the Focus Forward Project classes are made up of two volunteer facilitators and 6 -15 participants. The 12-week class meets once a week for two hours, and participants are required to complete weekly reading and journal assignments. The first hour of class is spent discussing and analyzing a book. The second hour of the class focuses on a different life skill each week.

Tyrell Whitaker immediately stood out among the other inmates in the program. Those impressions are expressed in part below.

a. First Letter

• "Tyrell's unfailingly positive attitude helped him with his accomplishments, too. From the beginning, Tyrell was comfortable sharing his past. He spoke openly, and vulnerably, about the negative world view he held before being incarcerated. Tyrell was not sure what he wanted out of life and was almost certain that, even he did know what he want, that he wouldn't be able to achieve those goals. However, now Tyrell sees himself as a changed person who is positive and knows when to walk away from trouble. It was immediately clear to us that this is absolutely true."

• "Tyrell's desire to genuinely do good was a large motivator, as well. During a game in which students asked one another thoughtful questions, Tyrell was asked, "If money was no object, what would you do and why?" to which he responded, "I would want to be a lawyer—not getting paid for my service wouldn't be a problem. Helping people fight for justice and equality would be all I need." Throughout the class, Tyrell often spoke of his desire to give, and, throughout the class, he did. He was quick to help students understand more complex themes in the memoir, helping his classmates make connections between their lives and the themes in the book. He would often listen to others and offer specific and personal advice, too. We are certain that not only will Tyrell achieve his potential, but he will work to ensure others become the best versions of themselves as well."

• "Tyrell is able to articulate a future—one with both short and long-term goals—and we are

confident, given's Tyrell's intellect, determination, and motivation, Tyrell will succeed in realizing his future. For short term goals, Tyrell shared he wanted to "take advantage of every resource and program that BOP has to offer me while in jail and help as many people as possible receive their GED while in jail." Tyrell clearly has taken advantage of educational offerings"

- "One week, Tyrell told our class that he had just received the first diploma of his life: his GED. He was the last of his siblings to receive his diploma, and Tyrell surprised his mother by sending her his certificate. Since completing his GED, Tyrell has continued to pursue a rigorous course load. While working on his resume, Tyrell brought in his transcript: he had taken over 36 classes including, but not limited to, African and African American Drama, a Moth storytelling class, and several zoology courses."

Moreover, the facilitators, Nora Stephens and Zoe Stahl when contacted by defense counsel immediately remembered Tyrell Whitaker and wrote an additional letter to the Court. Ms. Stahl and Ms. Stephens will be at Mr. Whitaker's sentencing and would like to address the Court as to why they emphatically believe that he should be released from prison.

b. Second Letter

- "We, as co-facilitators of FFP, also saw Tyrell's work ethic and curiosity firsthand. According to one of the correctional officers, Tyrell worked tirelessly to enroll in FFP. For years, he had tried to register for the class because he sought the academic challenge, and, once admitted, Tyrell took the utmost advantage."

- "Even more, Tyrell's course work was college-caliber."

- "We think this anecdote speaks to Tyrell's character. Tyrell is looking for every opportunity to improve himself and is willing to put in the time, effort, and brain-power to accomplish his goals. Through his self-improvement and learning, Tyrell has demonstrated that he would be an excellent fellow student or colleague"

- "Tyrell has tutored others in MCC to ensure they receive their high school diploma. He was also selected by correctional officers at the MCC to serve as suicide watch for his fellow inmates—which requires completing rounds every 15 minutes and writing detailed reports. Tyrell was selected, and kept, these roles because he is mature, dependable, and bright—all attributes which made him a leader in and friend to all in our class."

- "We also saw this emotional growth firsthand. During our speech-giving sessions, Tyrell opened up about the regret he feels for his past crimes. Tyrell chose to talk about this topic—it was not a requirement or even a suggestion. He expressed regret to a group that grew into a supportive community. There is no doubt that Tyrell's vulnerability inspired others to speak about their past regrets and why they feel equipped to change their lives now."

- "Your honor, we think so highly of Tyrell, that should he be released we would be more than willing to help with any or all of the following: (1) Help Tyrell figure out various housing, job, and school options; (2) In fact, Nora has an open apartment in Brooklyn and trusts Tyrell to live there

should he need to quarantine before returning to his family; (3) Connect Tyrell with organizations equipped to help Tyrell with navigating school, work, and housing opportunities; (3) Serve as a reference for Tyrell."

Although, Tyrell Whitaker was convicted years ago after trial, he continued to be incarcerated at the MCC – a pretrial detention center. Even prior to *United States v. Booker*, 543 U.S. 220 (2005), courts held that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departure." *See United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001). *See also United States v. Farouil*, 124 F.3d 838, 847 (7th Cir.1997) (harsh conditions of confinement constitute valid ground for departure); *United States v. Hernandez-Santiago*, 92 F.3d 97, 101 n. 2 (2d Cir. 1996) (remanding for reasons for downward departure due to "harsher incarceration" due to unavailability of programs); *United States v. Brinton*, 139 F.3d 718, 725 (9th Cir. 1998); *United States v. Mateo*, 299 F. Supp.2d 201 (S.D.N.Y. 2004); *United States v. Francis,* 129 F. Supp.2d 612, 616 (S.D.N.Y. 2001), *citing United States v. Sutton*, 973 F. Supp. 488, 491-495 (D.N.J. 1997).

Post-*Booker*, in *United States v. Behr*, 2006 WL 1586563 (S.D.N.Y. 2006), the Court noted that a judge had "reduced an individual's sentence by one third based upon the harsh conditions in Unit 11-South at MCC[.]" 2006 WL 1586563, at *5. In light of the harsh conditions at MCC, the defendant in *Behr* was sentenced to a non-Guidelines sentence. *Id.*

The same applies to MDC. The difficult and overcrowded conditions at MDC simply make every day at the facility more onerous than ordinary confinement. *See United States v. Spano*, 476 F.3d 476, 479 (7th Cir. 2007) ("in effect [the defendant] is arguing that the severity of a prison sentence has two dimensions: its length, and the harshness of the conditions, and that the harsher the conditions the shorter the sentence should be. There is enough merit to the argument to allow a sentencing judge to take it into account . ..").

The Horrific Conditions, Physical Abuse And Solitary Confinement Warrant A Reduced Sentence For Tyrell Whitaker

The BOP's failures to prevent serious illness and death pose a specific problem for Mr. Whitaker because he is a severe asthmatic and has suffered severe medical neglect during his time at MCC. Mr. Whitaker was one of the few inmates to be identified by the BOP as COVID-19 vulnerable in March 2020. As a result of his status, Mr. Whitaker was placed on a tier of the BOP that had little to no staff or any medical personnel and therefore was not given any medical attention, when he was most desperately in need of it. The few times the correction officers and/or staff did come to the unit - showing signs of sickness themselves - Mr. Whitaker begged for an inhaler, water and a blanket because his property had been disposed of in his transfer to the COVID-19 tier. Inexplicably, he was denied any of those items. We discuss more fully the below the issues that have plagued Mr. Whitaker since this pandemic has ravaged the BOP.

As the BOP staff significantly diminished, it appears that the BOP relied upon their special military police force referred to as the SORT Team (Special Operations Response Team) to deal with the potentially infected inmates such as Whitaker. In the time that the Sort Team has been at the BOP several instances of abuse have been reported to counsel. Specifically, with regard to Mr. Whitaker, the following has been reported to counsel through emails, phone calls and texts from family and friends

of Mr. Whitaker.[5]

• On or about March 7th during a lockdown Mr. Whitaker was locked in a cell with little to no ventilation. His inhalers were removed even though he reported to the staff that he was not be able to breathe. He spent at least 24 hours in his cell without any of his property, inhalers, food or water. He begged staff - when he could see them - for at least some water and his inhaler. Mr. Whitaker's requests were ignored and he remained on the ground of his cell fearing he was going to die because he could not breathe and did not know if help would ever come.

• Shortly after that, after being identified as potentially COVID-19 positive Whitaker was placed in isolation with other inmates that were exhibiting symptoms of the virus. He was denied any cleaning materials for himself or his cell. Again, he had two more asthma attacks that were visible to the staff – who refused to send him any medical attention.

• On or about March 11th the inmates on Mr. Whitaker's tier were finally seen by staff that provided them with one shirt and one sheet. Mr. Whitaker also received his inhalers. They were not permitted to shower or given any cleaning materials for their cell. Shortly after, Mr. Whitaker developed a painful rash that spread throughout his body. During this time no staff came back to the tier.

• It was not until April 13th, that the staff came to Mr. Whitaker's tier. At that time, Mr. Whitaker begged for medical attention for his rash. Mr. Whitaker described his rash as huge welts on his back and smaller raised bumps all over his body. Weeks later he was given a cream for his rash but it did not work and never addressed again by any personnel at the BOP.

• On or about April 16th, Mr. Whitaker's tier was raided by what we now know is the SORT Team for the BOP. The Sort Team, first deployed, what the client described as firecrackers and gas throughout the unit. Mr. Whitaker happened to be on the phone when a member of the SORT Team dragged him to the ground, removed some of his clothing, forced him into a spread-eagle position, face down with held a type of weapon to the back of head. He was also hand cuffed so tightly that Mr. Whitaker reported that the pain was so unbearable he began to have an asthma attack. Mr. Whitaker told the officers that he could not breathe and was going to die if he did not get his inhaler. The officers ignored him. Mr. Whitaker eventually lost feeling in his arms and hands. The SORT Team then proceeded to "beat him up." Mr. Whitaker was left hand cuffed and naked for several hours. Eventually, a day later, a corrections officer attempted to attend to Mr. Whitaker's wounds and took photographs because they were so severe. We requested those photographs and preservation of the videos. *(See* Forbes Article Dated June 19, 2020, attachment 8).

• On or about April 17th counsel received a phone call from another inmate and client, that was on

---

[5] Associate counsel Ying Stafford spent many hours in communication with Mr. Whitaker, his family and MCC personnel discussing the conditions at MCC in efforts to ameliorate them. She also researched and prepared a thirty single spaced memo for counsel to use in preparation of this letter submission. I wish to acknowledge her invaluable efforts for Mr. Whitaker over the past eight years. Ms. O'Boyle has also rendered extraordinary efforts and provided emotional support to our client and his family.

the same floor when the SORT Team raided the tier. At the time, counsel was unaware of the existence of the SORT team. Counsel asked why the unit had been raided and he stated that he did not know and no one told him why it had happened. He then stated that it was not the first time it had happened. Counsel then inquired as to who the people were that raided the tier and the client replied "that they refer to themselves as the SORT Team – they often patrol the tier." At the time, counsel assumed that the "SORT Team" was a small number of individuals that worked within the BOP. We immediately attempted to contact the BOP legal department by phone and email, but received no response.

- Approximately, one to two days later I received a phone call from Mr. Whitaker who reported to me that he was in still 23-hour lockdown, that no one explained to him or any of the other inmates why the tier was raided. He also reported that he had seen a doctor that told him that he most likely had nerve damage. Mr. Whitaker reported that he could not move his hand and that it was still numb. He also reported that the staff was getting more and more infected and no one was attending to his tier.

- On Or about June 3rd, Mr. Whitaker contacted counsel by phone to report that an BOP officer had gotten "slashed" by an inmate and referred to the climate as a "ticking time bomb." Mr. Whitaker feared that another attack from the SORT Team would be imminent.

- On or about June 5th, Mr. Whitaker sent the following text message "it is very important to me that the Judge be aware of what happened thinking about what the officer in [the] MDC [that] killed the inmate [it] makes me think about what happened to me. I am very fortunate that I didn't die. I pray that Ramos can understand what they did to me. I was tortured for over 3 […]. I still can't feel my left hand and I also have neck, back and shoulder pain that [the] BOP is not attending to at all[.] [D]ue to these lockdowns[,] I'm stuck in my cell all day losing my mind and in extreme pain."

- On July 6th, Mr. Whitaker reported that there is yet another outbreak of COVID-19 at the BOP, and as a result, was placed on lockdown and put in another cell. In the process of changing Mr. Whitaker's cell, the staff threw out Mr. Whitaker's inhalers. Again, the new cell, does not have proper ventilation. Days later, Mr. Whitaker got an inhaler but it is not strong enough to counteract the lack of adequate ventilation. As a result, Mr. Whitaker continues to have problems breathing. Additionally, Mr. Whitaker reported that he and the other inmates have not been permitted to shower for days or provided with clean clothing. Mr. Whitaker also reported that for some reason the inmates are sharing their clothes that are stained with feces, and urine.

- On or about July 3rd it was reported to counsel that one of our other clients at the MDC endured a similar raid by the either the staff or the roving BOP SORT Team. The client was also forced face down in his cell and subsequently severely beaten. The client suffered injuries sever enough that he required treatment at a nearby hospital.

Since July, 2020, it has still been a difficult tenure at MCC, as Your Honor surely knows as a result of litigation over which you preside.

All things considered; Mr. Whitaker should be freed. He has earned his freedom. He will not recidivate. He has made his team proud to represent him. This is evident from the letter submitted to

the Court by Mr. Whitaker and others including his correctional counselor B. Ekland, attachment 9.)

I take the liberty of including a passage from a summation of Clarence Darrow in the Leopold - Loeb murder case, a passage that has always resonated with me and I hope will resonate with Your Honor:

> If there is such a thing as Justice it could only be administered by one who knew the inmost thoughts of the man to whom he was meting it out. Aye, who knew the father and mother and the grandparents and the infinite number of people back of him. Who knew the origin of every cell that went into the body, who could understand the structure and how it acted. Who could tell how the emotions that sway the human being affected that particular frail piece of clay. It means more than that. It means that you must appraise every influence that moves men, the civilization where they live, and all society which enters into the making of the child or the man! if Your Honor can do it — if you can do it you are wise, and with wisdom goes Mercy.[6]

Thank you for your consideration. We remain

Respectfully,

/S/ GRGoltzer
/S/ Ying Stafford

*Attorneys for Tyrell Whitaker*

cc: All parties via ECF

---

[6] Attorney For the Damned, Clarence Darrow in the Courtroom, edited by Arthur Weinberger: University of Chicago press (1957, 1989)

11