

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 14, 2020

**BY ECF**
The Honorable Edgardo Ramos
United States District Judge
Southern District of New York
40 Foley Square
New York, New York

   Re:  United States v. Tyrell Whitaker,
       12 Cr. 626 (ER)

Dear Judge Ramos:

  The Government respectfully submits this letter in connection with the sentencing of defendant Tyrell Whitaker ("Whitaker" or the "defendant"), scheduled for October 20, 2020, at 11:00 a.m.

  On December 15, 2020, Whitaker and his co-defendants participated in a brazen armed robbery of an apartment belonging to Jeffrey Henry (the "Victim"), a known crack cocaine and marijuana dealer in Newburgh, New York. Several of the defendants, including Whitaker, armed themselves with firearms and entered the Victim's apartment by force. Despite the fact that they were unarmed, the individuals inside of the apartment attempted to fight back and were able to disarm defendant Raymond Christian. After obtaining Christian's firearm, a shootout ensued. The Victim, who was not in the apartment when the robbery began, arrived at the scene during the shootout. The Victim attempted to hold the front door to the apartment closed presumably to prevent the defendants' escape, while also calling the police. Several gunshots were fired in the Victim's direction and at least two struck him. The Victim died in front of his apartment shortly thereafter. Whitaker's conduct was extremely serious, resulted in the death of another person, and, as argued in greater detail below, warrants a Guidelines sentence of life imprisonment.

**A.  Factual Background**

  **1.  The Indictment**

  Superseding Indictment S3 12 Cr. 626 (ER) (the "Indictment") was filed in this District on December 18, 2013, in six counts, charging Tyrell Whitaker, and three co-defendants. Whitaker was charged in four counts. Count Two charged Whitaker with Hobbs Act robbery, in violation of Title 18, United States Code, Sections 1951 and 2. Count Four charged Whitaker with causing the death of a person through the use of a firearm, in violation of Title 18, United States Code, Sections 924(j) and 2. Count Five charged Whitaker with possession of a firearm in

furtherance of a crime of violence, which firearm was brandished and discharged, in violation of Title 18, United States Code, Sections 924(c) and 2. Count Six charged Whitaker with possession of a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Sections 924(c) and 2.

### 2. The Trial

Trial on the Indictment began on August 4, 2014. The Government presented testimony and evidence over the course of eleven days in its case-in-chief. That evidence and testimony consisted of (i) testimony from eighteen witnesses, (ii) physical evidence, including the bullet-riddled interior door and a ski mask recovered from the shootout at the apartment, (iii) photographs, including crime scene photographs taken shortly after the robbery and shootout, (iv) a video recording showing the robbers walking towards the location of the apartment before the robbery, and running way from the apartment after the robbery, (v) a 911 call placed by the Victim, (vi) expert testimony regarding the cause and manner of the Victim's death, (vii) expert testimony regarding DNA, and (viii) excerpts of a video recording of a conversation about the robbery. The Government's witnesses included law enforcement witnesses, eyewitnesses, and cooperating witnesses, some of whom participated in criminal conduct with the defendants. For example, Anthony Baynes, a cooperating witness and one of the participants in the robbery, testified and described how he knew the defendants and identified the participants in the robbery, including Whitaker. (Tr. 384-86).

All of this evidence established that Whitaker and his co-defendants participated in the December 15, 2010 robbery and shootout at 54 Chambers Street that resulted in the death of the Victim. More specifically, defendant Raymond Christian ("Christian") planned the robbery and enlisted the help of defendant James Williams ("Williams"), a high-ranking member of the Bloods in Newburgh. The object of the robbery was to steal drugs and drug proceeds. Williams helped Christian recruit other robbers, including Whitaker and defendant Glenn Thomas ("Thomas"), and helped the crew obtain guns for the robbery. Specifically, Williams directed other gang members to provide Whitaker and Thomas with guns for the robbery.

After meeting with Williams on Dubois Street in Newburgh, Whitaker and the rest of the defendants walked to 54 Chambers Street. There, they accosted several men who were standing outside at gunpoint and made their way inside. Two robbers served as lookouts and waited by the door while the defendants, including Whitaker, went inside. Inside, Whitaker and his co-defendants began forcing the victims, who were drug dealers, to the ground at gunpoint. Two of the victims resisted. One of them was able to wrestle Christian's gun from his hands. In the process, Christian also lost his mask. A gunfight ensued.

Whitaker and his co-defendants attempted to flee the location. As they tried to flee, however, they became trapped in the hallway leading out of 54 Chambers Street. The Victim had actually returned to 54 Chamber Street, heard the gunshots coming from inside, and attempted to block the door leading out in order to prevent the robbers from escaping. As a result, Whitaker and others took turns pulling on the front door, which was being held shut by the Victim who was standing on the opposite side of the door attempting to call 911. When the robbers were able

to crack the door open, one of them would shoot through the crack. At least two shots that were fired by the robbers hit the Victim, mortally wounding him.

### 3. Jury Verdict

On August 22, 2014, after deliberating for approximately one day, the jury returned a verdict, finding Whitaker guilty on Counts Two, Three, and Five. With respect to Count Five, the jury found Whitaker guilty of brandishing a firearm, but not discharging it. (PSR n. 1).

### 4. Whitaker's Motion for a Judgement of Acquittal

On August 6, 2015, the trial defendants, including Whitaker, filed motions for acquittal or a new trial. This Court denied those motions. Thereafter, the defendants filed supplemental motions for acquittal or a new trial. This Court also denied those motions.

## B. Pre-Sentence Investigation Report and Recommended Sentence

Probation issued its final PSR on June 10, 2020. As reflected in the PSR, Probation calculated a total offense level of 43. (PSR ¶ 38). Probation also calculated that Whitaker has zero criminal history points and is therefore in Criminal History Category I. (PSR ¶¶ 42-43). Based on a total offense level of 43 and a criminal history category of I, Probation determined that the applicable Guidelines range is life, to be followed by a consecutive term of five years' imprisonment on Count Four, and a consecutive term of seven years' imprisonment on Count Five. Probation recommended a sentence of life to be followed by seven years.[1]

## C. Discussion

### 1. Applicable Law

The Guidelines still provide important guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). Indeed, although *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," noting that that "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After making the initial Guidelines calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4)

---

[1] More specifically, Probation sentenced the defendant to 20 years' imprisonment on Count Two and life imprisonment on Count Four to run concurrently, and seven years' imprisonment on Count Five to run consecutively to the defendant's life sentence.

the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)–(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B)   to afford adequate deterrence to criminal conduct;
> (C)   to protect the public from further crimes of the defendant; and
> (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### 2.   The Section 3553(a) Factors Warrant A Guidelines Sentence

In this case, the Section 3553(a) factors justify a Guidelines sentence of life imprisonment. The most relevant factors include the nature and circumstances of the offense, and the need for the sentence to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct. 18 U.S.C. § 3553(a)(1), (2)(A), (B), (C).

*First*, a Guidelines sentence is necessary to reflect the nature and seriousness of the offense. Gang activity, narcotics distribution, and gun violence go hand-in-hand as gang members compete with one another for lucrative drug territory and street credibility. Unfortunately, cities like Newburgh, New York have played host to far too many instances of drug-related violence. The devastating effects that gang violence and drug dealing have had on poor and predominantly minority communities like Newburgh remain painfully obvious and are hard to overstate. Gang members arm themselves with deadly weapons ready to use them at the slightest provocation or in an effort to secure drugs or drug proceeds. Those who demonstrate a willingness to use violence are considered "real," and enjoy additional respect amongst their peers. Meanwhile, law-abiding men and women – who, contrary to popular belief, make up the vast majority of the residents of Newburgh, New York – are forced to be hyper vigilant in their own neighborhood for fear of being caught in a cross-fire; another casualty in a devastating and seemingly never-ending struggle for control of a neighborhood so many people hope to escape.

Despite having experienced firsthand the hardships that come with growing up in Newburgh, Whitaker decided that, rather than become a part of the solution, he would become a part of the problem. He agreed with others to commit a violent, gunpoint robbery of a known drug stash house. Whitaker, like several of his co-defendants, possessed a firearm during the robbery and, in doing so, made clear his willingness to resort to deadly force should the need arise. Worse, Whitaker and his co-defendants were willing to put lives at risk just for the chance at securing drugs and drug proceeds. But the robbery did not go as planned; the victims fought back. In response, Whitaker and his co-defendants literally attempted to shoot their way out of

Case 1:12-cr-00626-ER   Document 441   Filed 10/14/20   Page 5 of 7

Page 5

the situation and, in the process, the Victim lost his life. Said differently, the Victim was murdered so that Whitaker and his co-defendants could line their pockets with drug money and potentially making even more money by selling the drugs they stole. For that reason alone, a Guidelines sentence is warranted.

In his sentencing submission, Whitaker describes in detail the hardships he faced growing up. Specifically, he notes that he was "born into an environment plagued by poverty, neglect, gangs, drugs, and death of loved ones[.]" (Def. Sent. Sub. at 3). None of these experiences, however, excuse the fact that Whitaker participated in a violent robbery that resulted in the Victim being killed. To be sure, the Government's goal is not to minimize the struggles the defendant faced. To the contrary, the Government recognizes that the defendant's experiences may have had a lasting and negative impact on his social and emotional development. Yet, despite those experiences, the defendant chose to join the robbery crew to rob a drug stash house, he chose to get a gun before committing the robbery, and he chose to pull the trigger. Indeed, having witnessed firsthand the crime and drugs plaguing his neighborhood, he can hardly dispute the manifest need to remove extremely violent criminals like himself from the streets of Newburgh. The defendant was unfortunately not the only person struggling in Newburgh, he simply represents the small minority of people trying to keep things that way.

The defendant also asks that the Court treat him as a Juvenile Offender. (Def. Sent. Sub. at 2). The Court should disregard this argument completely. To be clear, the Government is not suggesting that the Court cannot take into consideration the defendant's age when he committed the charged offenses. Rather, the Government argues that the Court's decision to try the defendant as an adult should remain undisturbed. In his sentencing submission, the defendant argues that the Government made certain misrepresentations during the hearing to determine whether to transfer the defendant's case to adult status (the "Transfer Hearing"). Specifically, the defendant explains that the Government stated improperly that the defendant and another individual fired the shots the killed the Victim. (Def. Sent. Sub. at 2). According to the defendant, this argument was inconsistent with what the evidence showed at trial, namely, that it was impossible to determine who fired the shot that killed the Victim and that the bullets that struck the Victim were 9-milimeter bullets but the defendant was carrying a .38 caliber revolver during the robbery. (*Id.*) The defendant believes that had this information been provided to the Court, the Court would have denied the Government's motion to transfer the defendant's case. This argument fails.

As an initial matter, the Government's statements during the Transfer Hearing were not inconsistent with the evidence and the Government's arguments at trial. The defendant and at least one co-defendant did in fact open fire in the Victim's direction during the robbery, and the Victim was killed as a result. The fact that the defendant's bullets may not have killed the Victim does not change that fact, nor does it render the defendant any less culpable legally for the Victim's death. As a result, the defendant cannot establish that the Court's decision would have been any different. Indeed, had the Government chosen to stay silent with respect to who opened fire during the robbery, the Court could have still reasonably determined that Whitaker should be tried as an adult.

For example, the fact that Whitaker was seventeen and approximately nine months at the time he participated in the robbery and murder of the Victim weighed heavily in favor of transfer. *See United States v. Juvenile Male*, 754 F. Supp 2d 569, 576-77 (E.D.N.Y. 2010) ("[T] fact that [the juvenile] was only four months shy of his eighteenth birthday at the time of [his participation in two] alleged murders" weight "strongly in favor of transfer"); *United States v. Juvenile Male*, No. 10 Cr. 519 (JFB), 2011 WL 7415565, at *3 (E.D.N.Y. Feb. 2, 2011) (where juvenile was age seventeen years and six months at time he committed two attempted murders, "the fact that he was nearly eighteen years old, and therefore was almost an adult" weighed "strongly in favor of transfer"). Additionally, while the defendant had no convictions prior to his participation in the robbery, he had been arrested four times. Despite these arrests, and the leniency he was afforded in connection therewith, Whitaker nevertheless chose to participate in the robbery and murder of the Victim. While the defendant's prior arrests were not nearly as serious as the robbery in this case, the fact that the defendant participated in the robbery at all suggests a lack of respect for authority and that the defendant is not easily deterred. This too weighed heavily in favor of transfer. Moreover, there was no evidence that the defendant possessed below-average intelligence. And, most importantly, the offenses charged were extremely serious. Whitaker and his co-defendants committed an armed robbery of a drug stash house armed with multiple firearms. They entered the Victim's apartment, attempted to rob its occupants of drugs and drug money, and a gun battle ensued. A gun battle that resulted in the tragic death of the Victim. Accordingly, even if the defendant could establish that the Government made misrepresentations during the Transfer Hearing – he cannot – he cannot prove that the Court's decision would have been different had the alleged misrepresentations never been made.

*Second*, the goals of affording adequate general deterrence to criminal conduct and promoting respect for the law also militate strongly in favor of a sentence of life imprisonment. The defendant participated in the commission of the most serious crime that one can commit, and he did so under circumstances that demonstrate an utter disregard for human life. A sentence of life imprisonment will make clear that anyone involved in the death of another human being can expect to spend the remainder of his own life in prison.

**D.      Conclusion**

       For the reasons set forth above, the Government respectfully requests that the Court impose a Guidelines sentence on the defendant.

                      Respectfully submitted,

                      AUDREY STRAUSS
                      Acting United States Attorney

               by:   /s/ Christopher J. Clore
                     Christopher J. Clore
                     Assistant United States Attorney
                     (212) 637-1063

cc:  Defense Counsel (*by ECF*)