UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

– v. –

RAYMOND CHRISTIAN, GLENN THOMAS,
and TYRELL WHITAKER,

                              Defendants.

**OPINION AND ORDER**

12 Cr. 626 (ER)

Ramos, D.J.:

        Defendants Raymond Christian, Glenn Thomas and Tyrell Whitaker were found guilty

after a trial held in August 2014 of Counts One, Two, Four and Five of the above-captioned

indictment.  Those Counts charged them with conspiracy to commit Hobbs Act robbery, in

violation of 18 U.S.C. § 1951; Hobbs Act robbery, in violation of 18 U.S.C. § 1951; murder

through the use of a firearm relating to a crime of violence, in violation of 18 U.S.C. §

924(j); and brandishing a firearm during and in relation to a crime of violence, in violation

of 18 U.S.C. §§ 2 and 924(c)(l)(A), respectively.  On August 6, 2015, the Court denied

defendants' post-trial motions for acquittal or for a new trial. Doc. 243.  Thereafter, the

defendants filed supplemental motions for acquittal or for a new trial primarily on the basis

of a series of subsequently-decided Second Circuit and Supreme Court cases addressing:

(1) the definition of a "crime of violence" under 18 U.S.C. § 924(c) and (j); and (2) whether

the "risk of force" clause is unconstitutionally vague.  *See United States v. Davis,* 139 S. Ct.

2319 (2019); *Sessions v. Dimaya,* 138 S. Ct. 1204 (2018); *Johnson v. United States,* 135 S.

Ct. 2551 (2015); *United States v. Barrett,* 903 F.3d 166 (2d Cir. 2018); *United States v. Hill,*

832 F.3d 135 (2d Cir. 2016); *see also United States v. Taylor*, 979 F.3d 203 (4th Cir. 2020).[1] The defendants also argued that that Counts Four and Five should be dismissed because the Court's jury instructions on aiding and abetting the possession and use of a firearm were incorrect  under *Rosemond* v. *United States,* 134 S. Ct. 1240 (2014), and that Counts Four and Five are multiplicitous.  Defendant Christian separately requested that the DNA material recovered from the ski mask he wore during the robbery and murder of Jeffrey Henry be made available, and that a hearing be held concerning a photograph taken during a December 17, 2010 video-taped interview of Christian.  By Order dated October 17, 2019, the Court denied the motions.

Raymond Christian and Glenn Thomas have renewed their motion to set aside their convictions under Count Four and Count Five, murder through use of a firearm during and in relation to a crime of violence, and brandishing a firearm during and in relation to a crime of violence, respectively.  Both of these offenses are necessarily premised on their convictions under Count Two of the superseding indictment for attempted Hobbs Act Robbery.  Defendants argue that their attempted Hobbs Act Robbery convictions cannot serve as a predicate "crime of violence" for these offenses under 18 U.S.C. § 924(c)(3), and thus that these convictions must be set aside.

As set forth more fully below, because the Court finds that attempted Hobbs Act Robbery is categorically a crime of violence, the Court denies Defendants' renewed motions.  This opinion also explains the Court's rationale for denying the balance of defendants' motions pursuant to an order issued on October 17, 2019.

---

[1] The defendants requested adjournments of their sentencings pending determination of these cases.

## I.        Attempted Hobbs Act Robbery is Categorically a Crime of Violence

This issue turns on the construction of 18 U.S.C. § 924(c)(3).  The statute reads as fol-

lows:

> **(3)** For purposes of this subsection the term "crime of violence" means an offense that is
>
> a felony and—
>
>> **(A)** has as an element the use, attempted use, or threatened use of physical force
>> against the person or property of another, or
>>
>> **(B)** that by its nature, involves a substantial risk that physical force against the
>> person or property of another may be used in the course of committing the
>> offense.

18 U.S.C. § 924(c)(3).

Subsection A is commonly known as the "force" clause or "elements" clause; and Sub-

section B is commonly known as the "residual clause."  In 2019, the Supreme Court held that the

residual clause was unconstitutionally vague.  *See United States v. Davis*, 139 S. Ct. 2319, 2336

(2019).  Thus, the residual clause can no longer serve as a basis to find that attempted Hobbs Act

Robbery is a crime of violence.  Moreover, in light of *Davis*, the Second Circuit has also found

that a conspiracy to commit a Hobbs Act Robbery is not categorically a crime of violence.  *See*

*United States v. Barrett*, 937 F.3d 126, 127 (2d Cir. 2019).  However, there is no dispute that a

completed Hobbs Act Robbery is a crime of violence.  *See United States v. Hill*, 890 F.3d 51, 54

(2d Cir. 2018), *cert denied* 139 S. Ct. 844 (2019).  Thus, the only question here is whether the

force clause supports the classification of Christian and Thomas' *attempted* Hobbs Act Robbery

convictions as predicate crimes of violence.  The Second Circuit has not yet directly addressed

this question.

To assess whether an offense is a crime of violence under the force clause, Courts apply

the categorical approach.  Under this framework, the Court must identify the minimum conduct

necessary to sustain a conviction under the particular statute by reviewing its elements. *See Hill*, 890 F.3d at 55. If there is a "realistic probability" that the statute at issue proscribes conduct that does not involve the use of physical force, then the statute is not a categorical crime of violence. *Id.* at 56 (quoting *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007)). This probability cannot be hypothetical—that is, a defendant must at least point to their own case or other cases in which the statute was applied to conduct that supports their argument. *Id.* It does not matter if—as is the case here—the defendants in the instant case actually did use force, because under the categorical approach, the Court only looks to the elements of the offense and not the actual facts of the case before it. *See United States v. Hendricks*, 921 F.3d 320, 327 (2d Cir. 2019).

The parties disagree about exactly how to apply the categorical approach to the crime of attempted Hobbs Act Robbery. Both sides have some support. Indeed, this issue, like other applications of the categorical approach, has been the source of substantial differences of opinion in the courts.

### A. The Parties' Positions

Defendants argue that, to sustain a conviction for an attempt crime under federal law, including attempted Hobbs Act Robbery, "a defendant must (a) have the intent to commit the object crime; and (b) engage in conduct amounting to a substantial step towards its commission." *See Celaj v. United States*, No. 13-cv-1290 (ALC), 2021 WL 323303, at *12 (S.D.N.Y. Feb. 1, 2021) (internal quotations omitted). Thus, they argue, this Court must apply the categorical approach to assess whether either of these elements, in the context of an attempted Hobbs Act Robbery, proscribe conduct that falls short of the "use, attempted use, or threatened use of physical force." *See* § 924(c)(3)(a); Doc. 452 at 3–4.

Several district courts in this Circuit, as well as the Fourth Circuit, have followed this reasoning and found that attempted Hobbs Act Robbery is not a crime of violence because a

"substantial step" might include steps taken that are not cognizable under the force clause, such as reconnoitering, assembling weapons or disguises, or otherwise attempting to make an empty threat of physical force. *See United States v. Taylor*, 979 F.3d 203, 208 (4th Cir. 2020); *see also United States v. Jackson*, 560 F.2d 112, 120 (2d Cir. 1977) (finding it sufficient as a matter of law that the defendants "reconnoitered the place contemplated for the commission of the crime and possessed the paraphernalia to be employed in connection with the commission of the crime."). Judge Amon came to a similar conclusion in *United States v. Pica*, Nos. 08 Cr. 559 (CBA), 16 Civ. 3211 (CBA) (E.D.N.Y. March 17, 2020), Doc. 378. She reasoned that conduct such as Mr. Pica's attempted surveillance of a target with the intent to make an empty threat of force was sufficient to sustain a Hobbs Act Robbery conviction, but that such conduct was beyond the scope of § 924(c)(3). *Id.* at 9 (citing defendants' brief).

The Government argues that the reference to "attempted use" of physical force in § 924(c)(3) was intended to encompass attempt liability in connection with any crime that is categorically a crime of violence. *See* Doc. 464 at 3–4. It argues that the word "attempt," as used in the federal criminal code, was well-understood at the time of § 924(c)(3)'s adoption to refer to the specific intent to commit a crime, coupled with a substantial step toward the commission of that crime. Thus, the government argues, so long as these elements of the attempt offense are established with regard to a categorical crime of violence, the statute's command that one has engaged in the "attempted use" of physical force has been met. This is similar to the rationale recently adopted by the Third Circuit in *United States v. Walker*, which found that § 924(c)(3)'s inclusion of the "attempted use" of force was best understood as a term of art, referring to the attempt liability that lies when someone has the specific intent to commit a crime of violence and

takes a substantial step towards doing so.  *See* ---F.3d---, 2021 WL 833994, at *9 (3d Cir. Mar. 5, 2021).

The Government also argues that any "substantial step" toward a Hobbs Act Robbery is necessarily a crime of violence because the concept of a "substantial step" is necessarily a matter of degree, and may vary depending on the particular facts of each case and the crime charged.  *See United States v. Farhane*, 634 F.3d 127, 147 (2d Cir. 2011).  Thus, the Government argues that this Court should not focus on the conduct constituting a "substantial step" in isolation, but rather "on the nature of the act related to the offense as a whole."  Doc. 464 at 4.  Based on this understanding, the Government argues that any substantial step taken in furtherance of a Hobbs Act Robbery is categorically a crime of violence because such an act necessarily requires direct, concrete action with the intent that a robbery take place.  *Id.*

Several district courts in this Circuit, as well as the majority of Circuit courts to have considered this issue, have adopted some version of the Government's arguments.  The majority rule is that "when a substantive offense would be a violent felony . . . an attempt to commit that offense also is a violent felony so as long as the attempt offense requires proof of intent to commit all elements of the completed crime."  *See United States v. Ingram*, 947 F.3d 1021, 1026 (7th Cir. 2020) (internal citations and alterations omitted).  This is also the rule in the Third, Ninth and Eleventh Circuits.  *See United States v. Walker*, ---F. 3d---, 2021 WL 833994, at *10 (3d Cir. Mar. 5, 2021); *United States v. Dominguez*, 954 F.3d 1251, 1261 (9th Cir. 2020); *United States v. St. Hubert*, 909 F.3d 335, 352 (11th Cir. 2018), *cert. denied* 140 S. Ct. 1727 (2020), *and abrogated in part on other grounds by Davis*, 139 S. Ct. at 2336 (2019).

### B.  Analysis

The Court finds the Government's argument to be more persuasive.  As discussed in detail in *Walker*, the word "attempt" appears throughout the federal criminal code to refer to the

liability that attaches when an individual has the specific intent to commit a given crime and takes a substantial step toward doing so.  2021 WL 833994, at *9.  This suggests that the inclusion of the phrase "attempted use" in § 924(c)(3)(a) was meant to refer to such liability in relation to a crime that—if completed—requires the use or threatened use of force.  Indeed, as the Government observes in its letter motion, there is no federal crime that explicitly defines its elements by reference to the "attempted use" of force.  Doc. 464 at 5.

The Government's proposed interpretation of § 924(c)(3)(a) is also more consistent with how attempt liability is described in other substantive federal criminal offenses.  For example, as noted in *Walker*, the Hobbs Act Robbery statute and many other federal criminal laws provide for attempt liability within the same statute defining the substantive offense.  *See, e.g.*, 18 U.S.C. § 1951(a).  In such statutes, an "attempt" to commit that offense is understood to refer to the specific intent to commit each element of the crime, combined with a substantial step towards that commission.  Defendants' approach would have the Court disregard this commonly understood meaning of the word "attempt" in the context of § 924(c)(3), and instead focus on the "substantial step" in isolation from other factors.  It seems unlikely that it was Congress's intent to depart from the conventional meaning of "attempt."

The Government's argument is also consistent with the holdings of the majority of Circuit courts that have reached the issue, which have adopted the rule that "when a substantive offense would be a crime of violence under 18 U.S.C. § 924(c)(3)(A), an attempt to commit that offense is also a crime of violence."  *See United States v. Dominguez*, 954 F.3d 1251, 1261 (9th Cir. 2020).  Moreover, this principle is consistent with other Second Circuit cases finding that attempts to commit crimes of violence are themselves crimes of violence.  *See, e.g.*, *United States v. Thrower*, 914 F.3d 770, 776–77 (2d Cir. 2019) (per curium) (finding that attempted

third degree New York robbery was a crime of violence under the analogous Armed Career Criminal Act); *United States v. Tabb*, 949 F. 3d 81, 86 (2d Cir. 2020) (finding that attempted New York assault in the second degree is a crime of violence).

While Defendants argue that this principle is inconsistent with the application of the categorical approach, the logic of *Thrower* shows that this is not necessarily so. In *Thrower*, the Second Circuit considered a similar argument as Defendants proffer here, but in the context of attempted third degree New York robbery. *See* 914 F.3d at 777. That is, the defendants argued that attempted third degree New York robbery was not categorically a crime of violence because the government could sustain a conviction by merely showing that the defendant *attempted to threaten* to use force. *Id.* The Second Circuit ultimately rejected this argument because Defendants proffered no cases in which a Court *had* actually found that such conduct constituted a "substantial step" under the New York statute. *Id.* However, it also indicated in a footnote that "[e]ven if Thrower could cite to such an example, we would not come out differently on this issue" because "[a]n attempt to threaten to use force . . . itself constitutes a 'threatened use of physical force.'" *Id.* at n.6. While *Thrower* does not control this case because it addressed a different statute, the application of its logic is consistent with the definition of "attempted use" that the Government proffers here, as well as with the weight of authority from other Circuits that have directly addressed this question.

As recently observed by the Second Circuit in *United States v. Martinez*, the application of the categorical approach can be a "complex and vexing" task. *See* No. 15-1384-cr, Doc. 149-1, at 28 (2d Cir. Mar. 16, 2021). This case presents just how complex and vexing it can be, as there is little guidance from the Supreme Court as to how to reconcile the categorical approach with § 924(c)(3)'s reference to the "attempted use" of force. While Supreme Court is likely to

resolve this question at some point, the Court does not believe that, in the meantime, it is required to "read those same words out of the statute." *See Walker*, 2021 WL 833994, at *10.

Defendants' motions to set aside their sentences for Counts Four and Five are therefore DENIED.

## II.    The Court Correctly Instructed the Jury on Aiding and Abetting

The defendants argue that the Court's aiding and abetting instruction with respect to Counts Four and Five was erroneous, as it failed to comply with the requirements established by the Supreme Court in *Rosemond v. United States*, 134 S.Ct. 1240 (2014). In that case, the Supreme Court instructed that aiding and abetting a Section 924(c) offense requires both an affirmative act furthering the underlying offense and an intent to facilitate that offense's commission. *Id*. at 1245. The affirmative act requirement is met when the defendant facilitates any element of the underlying offense. *United States v. Robinson*, 799 F.3d 196, 200 (2d Cir.2015). The intent requirement is satisfied when the defendant has advance knowledge that one of his confederates will carry a gun. *Rosemond*, 134 S.Ct. at 1249.

### *Defendants' challenge is subject to plain error analysis.*

As a preliminary matter, the defendants made no objection to the substance of the aiding and abetting instruction at trial. Accordingly, defendants' challenge is subject to a plain error standard of review. *See* Fed.R.Crim.P. 30(d)(requiring a party who objects to any portion of the jury instructions or to a failure to give a requested instruction to "inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate" and providing that "[f]ailure to object in accordance with this rule precludes appellate review, except as permitted under Rule 52(b)"); Fed.R.Crim.P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."); *United States* v. *Tiller*, 302

F.3d 98, 105 (3d Cir.2002) (noting that failure to object at trial, absent plain error, constitutes a waiver of the issue for post-trial purposes"); *United States* v. *Fernandez*, 898 F. Supp. 82, 86 (N.D.N.Y. 1995) (when instruction is not objected to before it is given it is untimely and "reversal is proper only when there is plain error.").

To prevail on the exacting plain error review standard, a defendant must establish that (1) there is an error; (2) the error is plain, meaning clear or obvious rather than subject to reasonable dispute; (3) the error affected the defendant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings. *United States* v. *Olano*, 507 U.S. 725, 734 (1993).  For the reasons discussed below, defendants are unable to meet the high burden of establishing plain error.

<u>*Each Defendant is independently liable as a principal violator.*</u>

As the government suggests, and as the Court previously found in ruling on defendants' first wave of post-trial motions, there was sufficient evidence for a reasonable jury to convict each of the defendants as principal violators on Counts Four and Five.  Accordingly, the Court need not reach the defendants' challenge to the jury instruction on aiding and abetting the violation of those offenses.  *United States* v. *Sebbern*, 641 Fed. App'x 18, 21 (2d Cir. 2015) (holding that because there was sufficient evidence for jury to find that each defendant possessed a gun during a murder and therefore were principals, the Court need not reach the *Rosemond* based aiding and abetting jury instruction challenge).  As the Court previously found:

> I begin with the observation that the government's evidence in this case was strong. . . [T]he government's case was multi-faceted, consisting of co-conspirator testimony, the testimony of law enforcement witnesses, two victims of the robbery of 54 Chambers St. in Newburgh, NY, on December 15, 2010, an eyewitness to that robbery and murder, surveillance camera video of the perpetrators as they approached and then ran away from the location, a 911 call placed by the murder victim, objects obtained from

and photos of the crime scene, a pathologist who testified as to the cause of Mr. Henry's death, and an expert on DNA analysis who determined that DNA retrieved from a ski mask at the crime scene was consistent with the DNA of defendant Christian. This evidence is largely self-corroborating.  In addition, as the government correctly argues in my view, the testimony of co-conspirator Anthony Baynes, who participated in the robbery with the defendants, was sufficient in itself to sustain the convictions. And his testimony was directly corroborated by the other categories of evidence I listed above.  It is also the case, that Mr. Baynes, as well as the other government cooperators, including, importantly, James Mallory, were extensively and effectively cross-examined by three respected and experienced trial lawyers.

According to Anthony Baynes, it was Christian first came up with a plan to rob a local drug stash house and Christian who picked 54 Chambers Street as the target. On the night of the robbery, Baynes testified that he, Christian, and Christian's half-brother Laquavious Boykin, met with James Williams, the leader of the local affiliate of the Bloods Gang.  Baynes overheard Christian describe the proposed robbery and Williams' agreement that 54 Chambers St. was a good target, and his agreement to help with the robbery.  Baynes then heard Williams on the telephone telling someone to bring a gun.  Baynes, Christian and Boykin were then joined at Williams' home by defendants Whitaker and Thomas, and co-conspirator Rashawn Vassell. Williams did not take part in the robbery.  However, Baynes described how he and the other five, who were then joined by a seventh robber, Eric Cromartie, walked to 54 Chambers St.  Baynes' testimony in this regard is corroborated by surveillance video from a camera in the neighborhood.

Christian, Thomas and Whittaker were armed with guns.  When the robbers arrived at 54 Chambers Street, there were several men standing outside, the robbers pulled their guns on the men and directed them inside the house.  At that point, Baynes testified that, although he was initially directed to remain outside as a lookout, he entered the apartment when the victims tried to overtake the robbers.  Baynes testified how Christian lost his gun while wrestling with one of the victims inside and how Baynes was stabbed by another victim when he tried to help Christian.  Baynes testimony in that regard was corroborated by victims Akinto Boone, who testified that he struggled with one of the robbers who was wearing a ski mask-identified by Baynes as defendant Christian-and took his gun away, and another victim, Terrence Smith, who testified that he was able to grab a knife and stab one of the robbers, who was obviously Baynes.  Baynes also testified how Whitaker, Vassell, and Thomas took turns pulling at the door and shooting around the door at Mr. Henry, who had not been present when the robbers arrived and was holding the door shut from the outside; and how the robbers were able to escape.  Baynes saw Henry slumped against the wall as he ran out of 54 Chambers Street.  Here, Baynes' testimony was corroborated by Barbara Morreale, who lived across the street from 54 Chambers, and testified that on the night of the robbery and murder, she saw a number of men in hooded sweatshirts force their way into 54 Chambers, and then saw Mr. Henry as he tried to hold the door shut while making a call before he was shot.  A 911 tape played at trial captured Mr. Henry's final screams as he was shot while trying to call the police.

11

James Mallory, another co-conspirator, also testified about his involvement in the robbery.  On the night of the robbery, Mallory was at a stash house at 260 First St. in Newburgh with Kevin Burden, another Bloods gang member.  Mallory testified that Williams called him that night to tell Mallory that he was sending two people to get guns from Mallory.  The two people who came that night were defendants Whitaker and Thomas.  When Whitaker and Thomas arrived at the house, Mallory and Burden each gave Whitaker and Thomas two guns.  Mallory also relayed how when Thomas came back to return the gun, he told Mallory that they had been involved in a robbery and that Henry was killed in the shootout. Mallory also described seeing Whitaker return the gun that he had borrowed from Burden.  Several days after the murder, Mallory heard Christian talk about the robbery and how Christian had told the other robbers before they committed the robbery that there was a chance that someone could get shot.

Doc. 243, pp 5-9.

Based on the foregoing, it is clear that each of the defendants possessed, and, *at the very least*, brandished guns during the robbery—as the jury so found—and is therefore liable as a principal under the §§ 924 (c) and (j) counts.

<u>*The jury instructions on aiding and abetting were appropriate*</u>.

In any event, the instructions provided by the Court were in keeping with Second Circuit authority.

With respect to the 924(j) count, the Court instructed the jury as follows, in relevant part:

To convict Raymond Christian, Tyrell Whitaker and Glenn Thomas of Count Four, the government must prove each of the following five elements beyond a reasonable doubt: First, that on or about the dates alleged in the indictment, the charged defendants used or carried or possessed a firearm, or any combination of those acts, or aided and abetted the use carrying or possession of a firearm by another; Second, that the defendants used or carried the firearm, or aided and abetted the use and carrying of the firearm, during and in relation to the specified crime of violence, or that the defendants possessed a firearm in furtherance of the specified crime of violence; Third, that the defendants caused the death of a person through the use of a firearm; Fourth, that the death of that person qualifies as a murder, as I will define that term for you in a moment; and Fifth, that the defendants acted knowingly and willfully as I have previously defined those formation [sic] for you and you should apply those instructions here.

Tr. 2431-32.  The Court then advised the jury that it could also find the Defendants guilty of this Count under an aiding and abetting theory, which would be defined later.  (Tr. 2434) ("The

defendants are also charged in Count Four pursuant to the aiding and abetting theory of liability. Accordingly, it would be sufficient for this element if the defendants aided and abetted another person in the use, carrying, or possession of a firearm. I will shortly explain to you the concept of aiding and abetting.").

Later in its instructions on Count Five, the 924(c) count relating to the robbery, and Count Six, the 924(c) count relating to drug trafficking, the Court gave the following instruction, in relevant part, concerning aiding and abetting liability in connection with another's using, carrying, and possession of a firearm:

> I remind you that each charged defendant is also charged with aiding and abetting in the firearm count in which he or she is charged; accordingly, it would be sufficient for this element if the defendant you are considering aided and abetted another person in the use, carrying, and possession of a firearm, as I earlier defined those terms for you.

> I do want, however, to give you an additional instruction that applies to aiding and abetting the use, carrying of, or the possession of a firearm. In order to convict the defendant you are considering of aiding and abetting another's using, carrying out, or possession of a firearm, it is not enough to find that the defendant performed an act to facilitate or encourage the commission of the underlying drug trafficking crime with the knowledge that the firearm would be used or carried in the commission of that crime.

> Instead, you must find that the defendant performed some act that facilitated or encouraged the actual using, carrying of, or possession of the firearm in relation to the underlying crime. For example, if you find that the defendant directed another person to use, carry, or possess a gun in the commission of the underlying crime, or made such a gun available to the other person, then the defendant aided and abetted the other person's use of a firearm. Or, if you find that the defendant was present at the scene during the commission of the underlying drug trafficking crime, you may consider whether that defendant's use -- whether that defendant's conduct at the scene facilitated or promoted the carrying of a gun and thereby aided and abetted the other person's carrying of a firearm. These examples are only offered by way of illustration and are not meant to be exhaustive.

(Tr. 2441-42).

Finally, with respect to the standard instruction on aiding and abetting, the Court instructed the jury as follows:

> In connection with the charges contained in Counts Two, Four, Five, and Six of the indictment, the defendants are charged with committing certain criminal acts, and also with aiding and abetting the commission of these acts, in violation of Title 18, United States Code, Section 2.
>
> * * *
>
> In order to aid and abet another to commit a crime, it is necessary that the defendant you are considering willfully and knowingly associated himself in some way with the crime, and that he willfully and knowingly sought by some act to help make the crime succeed. To determine whether the defendant aided and abetted the commission of the crime with which he is charged, ask yourself these questions. Did he participate in the crime charged as something he wished to bring about? Did he associate himself with the criminal venture knowingly and willfully? Did he seek by his actions to make the criminal venture succeed?

(Tr. 2444-46).

None of the foregoing instructions were objected to by the defendants.  In addition, and more to the point, the language used by the Court does not run counter to the Supreme Court's guidance in *Rosemond*.  Indeed, the Court's language—"[i]nstead, you must find that the defendant performed some act that facilitated or encouraged the actual using, carrying of, or possession of the firearm in relation to the underlying crime"—which is consistent with the Second Circuit's pre-*Rosemond* standard in *United States v. Medina*, 32 F.3d 40, 45 (2d Cir. 1994), has been recognized as being more stringent than the "advance knowledge" language required by *Rosemond*.  *See, e.g., United States* v. *Santana*, 552 Fed. App'x 87, 90 n. 1 (2d Cir. 2014) (noting, in response to the Supreme Court's grant of certiorari in *Rosemond*, that the other Circuits' 924(c) aiding and abetting standards required less of the government than the Second Circuit's, and thus "*Rosemond*'s outcome will not affect the result [in that case] because this Circuit requires active facilitation or encouragement in order to establish aiding and abetting liability, which imposes the strictest standard of proof on the government").

It is for this reason, for example, that the Second Circuit upheld the type of language used by the Court here in response to a *Rosemond* challenge in *United States* v. *Young*, 561 Fed.

14

App'x 85, 92 (2d Cir. 2014).  In that case, the Court noted that the district court had instructed the jury "in accordance with *United States* v. *Medina*, 32 F.3d 40, 45 (2d Cir.1994), [and] that such liability attached under § 924(c) if the defendant 'performed some act that facilitated or encouraged the actual using, carrying of, or possession of the firearm in relation to the underlying crime.'"  *Young,* 561 Fed. App'x at 92.  The Second Circuit reasoned that "[b]y finding that [the defendant] encouraged the 'actual using, carrying of, or possession' of a firearm in the […] robbery, the jury necessarily also had to find that he had advance knowledge of the firearm-related conduct, consistent with the Supreme Court's explication in Rosemond."  *Young,* 561 Fed. App'x at 92.

While it is true, as defendants point out, that this instruction was given in connection with the § 924(c) counts (after previously having instructed the jury on the § 924(j) count), and that there is language concerning the "commission of the underlying drug trafficking crime," which related only to Count Six, on which defendants were acquitted, it is clear in context that the instruction applied equally to the § 924(c) count related to the Hobbs Act Robbery Count, as well as the § 924(j) count.  Specifically, when instructing the jury on the § 924(j) count, the Court had previously told the jury that it would provide additional instruction on aiding and abetting that count.  (Tr. 2434).  In addition, the prefatory language to the instruction speaks in general terms. (T. 2441) ("I do want, however, to give you an additional instruction that applies to aiding and abetting the use, carrying of, or the possession of a firearm.  In order to convict the defendant you are considering of aiding and abetting another's using, carrying out, or possession of a firearm, it is not enough to find that the defendant performed an act to facilitate or encourage the commission of the underlying drug trafficking crime with the knowledge that the firearm would be used or carried in the commission of that crime.")   Thus, looking at the charge as a whole,

there is no reason to believe that the jury understood this limiting instruction to only apply to the 924(c) counts.  *See United States* v. *Gabinskaya*, 829 F.3d 127, 132 (2d Cir. 2016) ("As a general matter, no particular wording is required for a jury instruction to be legally sufficient, but rather, this Court must 'look to the charge as a whole to determine whether it adequately reflected the law and would have conveyed to a reasonable juror the relevant law.'") (quoting *United States* v. *Mulder*, 273 F.3d 91, 105 (2d Cir. 2001)).

Finally, even assuming that the Court's instruction was in error, and that such error was plain, the motion would still be denied because, as discussed above, the strength of the government's proof on the issue of whether the defendants had "advanced knowledge" that each of them would possess, carry and use a gun during the robbery was significant.  Thus, it cannot be said that any error affected any defendant's substantial rights, "which in the ordinary case means it affected the outcome of the district court proceedings; and … the error seriously affect[ed] the fairness, integrity or public reputation of [the] judicial proceedings."  *United States* v. *Olano*, 507 U.S. 725, 734 (1993); *see also Molina-Martinez* v. *United States*, 136 S. Ct. 1338, 1343 (2016).

### III.    Counts Four and Five are not Multiplicitous

Defendants argue that Count Five is a lesser-included offense of Count Four, constituting multiplicitous charges in violation of the Double Jeopardy Clause of the Fifth Amendment. Count Five alleges that the defendants possessed, used and carried firearms that were brandished and discharged during the robbery conspiracy and attempted robbery on December 15, 2010, in violation of 18 U.S.C. § 924(c).  Defendants assert that Count Five is a lesser-included offense of Count Four because that count allege that the defendants possessed, used and carried firearms that were brandished and discharged during the robbery conspiracy and attempted robbery on December 15, 2010, causing the death of Jeffrey Henry, in violation of 18 U.S.C. § 924(j).

16

The Fifth Amendment's command that no "person be subject for the same offense to be twice put in jeopardy," U.S. Const., amend. V, does more than simply preclude successive prosecutions for the same charge. It also "violates the Double Jeopardy Clause" for an indictment to "charg[e] a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." *United States* v. *Chacko*, 169 F.3d 140, 145 (2d Cir. 1999). "When a defendant has violated two separate criminal statutes, the protection against double jeopardy is implicated … when one offense is a lesser included offense of the other." *Aparicio* v. *Artuz*, 269 F.3d 78, 96 (2d Cir. 2001); *see also United States v. Davenport*, 519 F.3d 940, 943 (9th Cir. 2008) (double jeopardy prohibition applies both when two "statutes prohibit the same offense or when one offense is a lesser included offense of the other").

An indictment is multiplicitous "when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." *United States v. Chacko*, 169 F.3d at 145. In assessing a multiplicity challenge, the focus is not on whether the same conduct underlies the counts; rather, it is whether the offense—as defined by Congress—complained of in one count is the same as that charged in another. *Id*. at 146; *United States v. Fiore*, 821 F.2d 127, 131 n.5 (2d Cir. 1987) ("In general, the *Blockburger* test is to be applied to the statute alone, irrespective of the facts alleged in a particular indictment."). As the Supreme Court explained in *Albernaz v. United States*, "[i]t is well settled that a single transaction can give rise to distinct offenses under separate statutes without violating the Double Jeopardy Clause." 450 U.S. 333, 344 n.3 (1981) (citations omitted).

To conduct the multiplicity inquiry, courts are directed to apply the *Blockburger* test. *See United States v. Chacko*, 169 F.3d at 146; *see also United States v. Dixon*, 509 U.S. 688, 697 (1993). The *Blockburger* test "examines whether each charged offense contains an element not

contained in the other charged offense. *United States v. Chacko*, 169 F.3d at 146 (citing *Dixon*, 509 U.S. at 696). "If there is an element in each offense that is not contained in the other, they are not the same offense for purposes of double jeopardy, and they can both be prosecuted." *Id*. (citing *Dixon*, 509 U.S. at 696). If the two offenses are distinct offenses under the *Blockburger* test, the defendant's multiplicity challenge fails unless the court finds clear Congressional intent to bar prosecuting a defendant for both offenses. *See Albernaz v .United States*, 450 U.S. at 339-42 (*Blockburger* test controls multiplicity analysis absent a "clear indication of contrary legislative intent").

Here, as the Government notes, the Second Circuit has not directly addressed the issue of whether the Government may bring separate charges under Sections 924(c) and 924(j) alleging distinct criminal acts in connection with the same predicate offense, for example, a single Hobbs Act robbery. The Second Circuit has, however, observed in an unpublished opinion that, "§ 924(j)'s authorization of the death penalty and life imprisonment likely indicates that it is a *stand-alone offense . . .*" *United States v. Young*, 561 F. App'x 85, 94 (2d Cir. 2014) (emphasis added). Moreover, as the government has pointed out, in a recent summary order, the Second Circuit took no issue with the charging of separate Section 924(c) and 924(j) counts in connection with the same drug conspiracy. *United States v. Barnes*, 560 F. App'x 36, 42-43, United States v Barnes, 11 Cr. 184 (DLC), S4 Superseding Indictment, Dkt. No. 53 (*compare* Count Two with Count Eight).

Given the Second Circuit's suggestion that § 924(j) defines a distinct offense, and that it requires a proof of at least one element that the § 924(c) count does not, namely the murder of an individual in connection with a crime of violence, the inclusion of both statutes in the same indictment does not violate the *Blockburger* test.

**IV.    Christian is not Entitled to Additional Discovery**

Finally, defendant Christian separately asks that the DNA material recovered from a ski

mask he wore during the robbery and murder be made available, and that a hearing be held

concerning a photograph taking during a December 17, 2010 video-taped interview of Christian.

Both requests are denied.

_Christian is not entitled to conduct a further DNA test._

The government presented evidence that Christian wore a ski mask that covered part of

his face during the robbery and that the mask fell off during an altercation with one of the victims

of the robbery.  The mask was seized and subjected to DNA testing.  In the Court's August 6,

2015 oral decision on defendants' first post-trial motions, it described the DNA evidence as

follows:

> At trial, the government presented the expert testimony of Daniel Myers, who
> concluded that the DNA on a ski mask that was recovered from the crime scene was con-
> sistent with the DNA of defendant Christian, and that Christian was "major contributor"
> to the sample.  He also found that two other individuals were minor contributors.  Chris-
> tian argues that the testimony was insufficient because Myers did not test the sample
> against the DNA of Christian's half-brother Laquavious Boykin, who also participated in
> the robbery, because the mask contained the DNA of an undetermined number of other,
> minor participants, and because the DNA sample may have deteriorated prior to testing.
> However, these were all challenges that were argued vigorously before the jury during
> cross examination of Mr. Myers and in counsel's closing argument.  The jury was entitled
> to credit Myers' testimony, and if it did, because it is not necessarily the case that the jury
> relied on it, it is not the province of this Court to second guess their determination.  "The
> proper place for a challenge to a witness's credibility is 'in cross-examination and in sub-
> sequent argument to the jury," not in a brief.  _United States v. Roman_, 870 F.2d 65, 71
> (2d Cir. 1989).

> And of course, even if the DNA evidence was not sufficient, as Christian sug-
> gests, it is hardly the only piece of evidence that was received against as discussed earlier
> in this opinion. A conviction must be upheld if "any rational trier of fact could have
> found the essential elements of the crime beyond a reasonable doubt." _United States v._
> _Persico_, 645 F 85, 105 (2d Cir. 2011).  Here, even if I were to discount the DNA evi-
> dence, the conviction is amply supported by other evidence.

Doc. 243 at 31-32.

At the outset, the Court notes that there is no dispute that the DNA evidence was made available to Christian's counsel in September 2012, 23 months before trial.  Doc. 320 at 27 n.5. Yet at no time prior to trial, did counsel request that the evidence be tested by his own expert. Mover, even if the Court were to allow additional testing to be done, and even if the additional testing proved less conclusive than the testing conducted by the government, that would not cause the Court to question that Christian was convicted on sufficient evidence.  *See United States* v. *Boyd*, No. 09 Cr. 347 (JSR), 2011 WL 182109, at *1–2 (S.D.N.Y. Jan. 13, 2011) (holding that even setting aside the Government's DNA expert's testimony, there was significant evidence of the defendant's guilt such that any new DNA testing would not create reasonable probability that the

defendant is innocent.).


*Christian is not entitled to a hearing on the photograph.*

As related by the government, on December 17, 2010, two days after the robbery and murder, Christian was interviewed by officers with the Newburgh Police Department.  The interview was video-taped.  During the interview, a Newburgh police officer also took a picture of Christian.  As with the DNA evidence, there is no dispute that the government provided a copy of the video-taped confession to defense counsel in October 2012, 22 months prior to trial.  And even prior to trial, Christian apparently believed that the video-tape held some exculpatory force because it shows that two days after the robbery he had no visible injuries on his face, despite the fact that the government's evidence was that he engaged in a struggle with one of the victims. However, for reasons sufficient to themselves, counsel for Christian did not want to show the

video to the jury.  Instead, it asked the government to enter into a stipulation that provided in relevant part:

> "On December 17, 2010, Raymond Christian was interviewed by one or more members of the City of Newburgh Police Department, and this interview was recorded on video. If viewed, the video of this interview would depict that Raymond Christian did not have any visible injuries on his head, face, body, hands or arms that day including, but not limited to any scratches, lacerations, cuts, bumps or bruises."

Doc. 320, Ex. A.

The government declined to agree to the stipulation.  It is clear, however, that even prior to trial, Christian was aware of the video, and of the potential use he could make of it.

At trial, Christian requested that the Government make available one of the officers present for the interview to be called as a defense witness, presumably to testify to the lack of visible injuries to Christian's face.  Doc. 320 p. 33.  The Government made a witness available but the witness was never called by the defense.  *Id.*

Approximately one and one-half years after trial, during a conference in this case, Christian's counsel raised the issue of the photograph and the Court instructed the Government to make inquiry.  The Government reported back as follows:  that it had "reviewed its files and conferred with the case agent, it had determined that (i) the December 17, 2010 interview of Christian was a video recording and was provided to Christian's defense counsel on October 26, 2012; (ii) towards the end of the video, a photograph was taken of the defendant by one of the interviewers; and (iii) the Government understands that the photograph was never saved or downloaded, the Government does not have any such photograph in its files, nor does it appear that any such photograph is in the files of the Newburgh City Police Department."  Doc. 320 p. 34. The Court determines that Christian is not entitled to any further discovery or a hearing with respect to the photograph.

First, it is clear that Christian had at his disposal sufficiently in advance of trial the equivalent of that which he requested many months after trial:  visual evidence of the fact that he appeared to have no injuries to his face two days after the robbery.  Counsel made a tactical decision not to use that evidence and they should not be heard to complain, months later, that he does not have additional evidence of that fact.  *See United States* v. *Hatfield*, No. 06-Cr-550 (JS), 2009 WL 10673620, at *3 (E.D.N.Y. July 10, 2009); *see also Cox* v. *Ebert*, No. 06-CV-3159 (PAC), 2007 WL 2948160, at *8 (S.D.N.Y. Oct. 10, 2007) (finding that the prosecution had not violated its *Brady* obligations because "the defendant was aware of facts permitting him to take advantage of exculpatory evidence.").  Further, as the government emphasizes "evidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney 'either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence.'"  *United States* v. *Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995) (quoting *United States* v. *Zackson*, 6 F.3d 911, 918 (2d Cir. 1993)); *Tankleff* v. *County of Suffolk*, 2015 WL 13264439, at *4 (E.D.N.Y. 2015) (government does not commit a *Brady* violation when the evidence was equally available to the defense, and the defense chose not to pursue a particular course of investigation).  Having made his decision, Christian is entitled to nothing more.

## V.    CONCLUSION

For the reasons set forth above, defendants' motions are DENIED.


It is SO ORDERED.


Dated:   March 23, 2021
      New York, New York

                    _____
                        Edgardo Ramos, U.S.D.J.